FILED
2012 May-30 PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | } |
| | } |
| v. | } Case No.: 2:11-CR-492-RDP-HGD |
| | } |
| MARCOS ROSAS-ILLESCAS | } |
| also known as Omar Rojas-Bozziere, | } |
| | } |
| Defendant. | } |

**MEMORANDUM OPINION**

In *United States v. Jones*, the Supreme Court held that attachment of a global positioning system ("GPS") tracking device to a vehicle, and subsequent use of that device to monitor the vehicle's movement on public streets, was a search within the meaning of the Fourth Amendment. 132 S. Ct. 945 (January 23, 2012). In light of that decision, Defendant Marcos Rosas-Illescas has moved to suppress all evidence and any statements obtained as a result of what he contends was a warrantless search and arrest that was in violation of the Fourth Amendment. (Doc. # 6).

The court conducted a hearing on the motion to suppress on March 8, 2012 (Doc. # 13), heard the testimony of two witnesses — ICE Agent Daniel McKenzie and Pelham Police Officer Steve Johnson (Tr. at 2),[1] and permitted briefing on the motion once the transcript was available. The facts of this case are really not in dispute. (See Docs. # 11–14). The question the court must address is how the law applies to those facts.

---

[1] Citations denoted "Tr." are to the transcript of the March 8, 2012 hearing. (Doc. # 13).

**I.     FACTS**

The court makes the following findings of fact based upon the evidence presented at the March 8, 2012 hearing:

1.     In December 2011, Immigration and Customs Enforcement ("ICE") agents received information from a confidential informant that a suspected illegal alien, who had been previously deported, was working at the Purple Onion ("Purple Onion") restaurant in Pelham, Alabama. (Tr. at 5). The informant stated that the individual drove a red Ford F-150 truck. (*Id.*)

2.     On December 5, 2011,[2] ICE Agent McKenzie ("McKenzie") went to the Purple Onion and observed a red Ford F-150 ("Ford" or "truck") parked there. (*Id.* at 6, 25). At that time,[3] it is undisputed that McKenzie installed a GPS device on the Ford without obtaining any warrant. (*Id.*) McKenzie readily admitted that the GPS's purpose was to allow agents to track the driver's movements and travel patterns, and to "determine the identity of the individual driving the pickup truck" and whether he was someone who illegally reentered the United States. (*Id.* at 16).

3.     After the warrantless GPS installation, McKenzie and two other agents waited outside the Purple Onion for some time. (*Id.* at 6). Eventually, an individual came out of the Purple Onion, got into the Ford, and drove off. (*Id.*) Thereafter, McKenzie and the others followed the Ford to the

---

[2] Although McKenzie initially stated that the date on which he attached the GPS device to the Ford was November 5, 2011 (Tr. at 6), he later testified that the date was *December* 5, 2011 (*Id.* at 25). Further, Defendant's counsel confirmed to the court that the GPS was placed on the truck on December 5 (*Id.* at 56), and both parties referenced December 5 in their briefs. (Docs. # 11, # 9, and # 12 ). Accordingly, the court views December 5 as the date on which the GPS device was installed on the truck, and construes the events described as occurring on November 5 at the hearing as actually occurring on December 5. But, to be sure, the difference in dates is not material here. Both dates preceded the Supreme Court's decision in *Jones*.

[3] To be clear, the placement of the GPS device occurred about a month and a half *before* the Supreme Court's decision in *Jones*.

Little Mountain Apartments (the "Apartments"). (*Id*.) There, the driver exited the Ford and entered an apartment. After waiting for about 30 minutes, agents concluded that the driver would remain overnight at the Apartments, terminated their visual surveillance, and left. (*Id*.)

4.      On December 7, 2011, McKenzie used the GPS to locate the Ford, which was parked at a Five Guys ("Five Guys") restaurant in Hoover, Alabama. (*Id*. at 6). McKenzie went to the Five Guys and initiated visual surveillance outside the restaurant. (*Id*.) A driver later got into the Ford and left. Followed by McKenzie, the driver went to the Apartments. (*Id*.) McKenzie then called Pelham Police Officer Johnson ("Johnson"), who was in the area, to assist in identifying the driver of the Ford and to perform a "probable cause traffic stop." (*Id*. at 6-7, 32-33 (Johnson testimony)).[4] The driver got back into the Ford and left the Apartments. (*Id*. at 7).

5.      McKenzie followed the Ford out of the Apartments and into a private parking lot, where he observed the driver fail to use a signal before turning. (*Id*.) McKenzie notified Johnson, with whom he was speaking on a cell phone, of what McKenzie had observed, but Johnson responded that he (Johnson) did not witness the alleged turn signal violation. (*Id*.) Because Johnson did not observe the failure to signal, he did not stop the Ford driver for that violation. (*Id*.) McKenzie admitted that the Ford was proceeding at a "normal [speed] through a parking lot." (*Id*. at 21).

---

[4] McKenzie testified that the stop technique employing GPS has often been used to track down illegal aliens for several reasons. (*Id*. at 15-17). First, historically it has been better for local law enforcement to conduct the initial stop (rather than an ICE agent) because, "more times than not, illegal aliens are more apt to give local law enforcement their true identity rather than ICE agents their true identity." (*Id*. at 16). Second, without a stop, all an ICE agent could do would be to "approach the vehicle, identify myself as an ICE HIS Special Agent and ask for the individual to talk to me, at which point the individual could have said no and left." (*Id*. at 15). Third, GPS can be utilized to monitor where an individual lives, so that agents "could have checked for power for another name, run that name." *(Id*. at 16).

3

6. The Ford then drove out of the private drive onto Big Mountain Circle, a public road. (*Id*. at 34). McKenzie continued to follow the Ford. (*Id*. at 20-21). McKenzie admitted that there was no flow of on-coming traffic on the Big Mountain Circle as the Ford proceeded to make the turn. (*Id*. at 23). McKenzie further admitted that "he [the Defendant] wasn't going fast . . . ." (*Id*. at 22; *see* at 46-47 (Johnson admitted that the driver was not "squealing his wheels or anything" in turning onto the road)). In fact, McKenzie readily admitted that the Ford driver was operating the Ford in a "safe and prudent manner" in the turn, but that he did not come to a complete stop. (*Id*. at 23-24).

7. Johnson, like McKenzie, personally observed the turn made by the Ford onto Pelham Parkway. Johnson stated that the driver was supposed to "stop yield" when exiting a private drive onto a public road. (*Id*. at 44-46). Johnson testified that a "stop yield" does not require a full stop, but rather simply requires that the driver yield to oncoming traffic — of which there was none, by McKenzie's admission. (*Id*. at 23, 44-46). Nevertheless, Johnson testified that the driver of the Ford failed to "check up" before proceeding out of the private drive and onto Pelham Parkway. (*Id*. at 47, 51). Johnson pulled the Ford over for an alleged violation of Ala. Code § 32-5A-114. (*Id*. at 44, 54). McKenzie pulled in behind Johnson's vehicle. (*Id*. at 8).

8. After the stop, Johnson asked the Ford's driver (*i.e.*, the Defendant) to produce a driver's license. (*Id*. at 48). Defendant produced a Mexican identification card, which Johnson shared with McKenzie back at the patrol car. (*Id*. at 8). Johnson asked Defendant to step out of the Ford. (*Id*.) McKenzie identified himself to the driver and asked for consent to take his fingerprints, which was granted. (*Id*.) Thus, the GPS data was used to determine the whereabouts of the Ford and its driver. (*Id*. at 16).

9. The next day (December 8th), McKenzie ran a search using the driver's fingerprints and determined that the driver was Marcos Rosas-Illescas, who had been previously deported. (*Id*. at 9). McKenzie continued to monitor the movements of the Ford using the GPS device and data for the following several weeks. (*Id*. at 29-31).

10. On December 21 (nearly two weeks later),[5] McKenzie began searching for Marcos Rosas-Illescas. (*Id*. at 10, 28). He drove by the Purple Onion and the Apartments, but the red truck was not there. (*Id*.) McKenzie then drove to the Five Guys where he had seen the truck before. (*Id*.) The Ford was parked in the same gravel lot he had observed previously. McKenzie watched the truck, and when he saw the driver get in the Ford, he followed it back to the Apartments. (*Id*. at 10). On December 21, McKenzie testified he did not utilize the GPS device to track the Ford's movement (*Id*. at 10, 28); that testimony is undisputed.

11. As the driver parked the Ford and exited the vehicle, McKenzie and the other ICE agents intercepted Defendant in the Apartments' parking lot, identified themselves, and asked for the driver's identification. (*Id*. at 10). The driver provided the same identification material as had been produced in the initial December 7th stop. (*Id*. at 10-11). McKenzie confronted the driver and told him that he believed the driver's identity to be Marcos Rosas-Illescas based on the fingerprints which had been obtained on December 7th. Defendant admitted that was his identity. (*Id*. at 11). McKenzie then called Pelham Police and had the driver placed in custody for an outstanding warrant.

---

[5] When asked on cross examination, McKenzie stated that he did not know why there was a two-week delay between the 8th and Defendant's eventual arrest on the 21st, and could only explain that it was possible he was working on other cases. (*Id*. at 30).

(*Id.*)  Once in custody at the Pelham Jail, McKenzie interviewed Defendant.  (*Id.*)  McKenzie also obtained additional admissions from Defendant in that interview.  (*Id.*)

12. Thus, in summary, the evidence at the hearing established that law enforcement utilized a warrantless GPS installation on the red Ford F-150 to track Defendant's whereabouts between December 5–7, 2011.  On December 5th, however, McKenzie used actual physical surveillance to follow Defendant back to his apartment complex.  The GPS surveillance was utilized on December 7th to locate the Ford F-150 at the Five Guys.  McKenzie went there and began visual surveillance of the truck, subsequently followed the driver to the point of the stop, and worked closely with Johnson to stop the vehicle for a purported traffic violation.  It was during that stop that Defendant presented what turned out to be false identification, talked with McKenzie, and was fingerprinted.  On December 8th, McKenzie ran a search and determined the actual identify of Defendant — that is, Marcos Rosas-Illescas — and that Defendant had previously been deported.  Over the next two weeks, McKenzie continued to monitor the movements of the Ford F-150 using the GPS device, but did not initiate any physical surveillance or a stop.  Finally, on December 21st, McKenzie and two of his fellow agents went to the Five Guys and initiated physical surveillance without use of the GPS device, and ultimately followed Defendant back to the Apartments.  It was there and then that Defendant was intercepted and arrested.

## II.  ANALYSIS

Defendant seeks to suppress "all evidence and any statements obtained as the result" of McKenzie placing a GPS tracking device on Defendant's truck.  (Doc. # 6 at 1).  Defendant asserts that the evidence is due to be suppressed because the use of the GPS device constituted "an unreasonable search under the Fourth Amendment."  (*Id.*)  Defendant relies upon *Jones*, which held

that the use of a GPS tracking device on a defendant's car is a "search" for Fourth Amendment purposes. The Government acknowledges the *Jones* decision but argues that it did not decide whether such a search would be unreasonable in circumstances like those presented here. This court need not decide that question, however, because even assuming a Fourth Amendment violation occurred here,[6] suppression of identity evidence related to Defendant is not warranted.

1. **Even Assuming There Was a Fourth Amendment Violation, Evidence of Defendant's Identity Is Not Due to Be Suppressed.**

Even if the use of the GPS device amounted to an unreasonable search and a violation of the Fourth Amendment (or, for that matter, even if the stop of Defendant's truck was unreasonable), the suppression remedy is not available with respect to evidence of a defendant's identity. The Eleventh Circuit has squarely held that "the exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution." *United States v. Farias-Gonzalez*, 556 F.3d 1181, 1189 (11th Cir. 2009).

In *Farias-Gonzalez*, the defendant was charged with illegal re-entry after deportation, in violation of 8 U.S.C. § 1326. The defendant filed a motion to suppress all evidence obtained as a result of an allegedly unconstitutional search. That search included photographs of his tattoos, fingerprints, and information contained in his alien file. The district court declined to suppress that evidence, even though it found an unreasonable search — and thus a Fourth Amendment violation

---

[6] It is not clear from the briefs whether Defendant contends that when Johnson stopped him for failing to stop/yield, that was a separate Fourth Amendment violation. To the extent that is Defendant's position, the court disagrees. Although Johnson admitted that Defendant was not speeding when he entered Big Mountain Circle, and further that there was no oncoming traffic when Defendant turned onto that road, Johnson personally observed Defendant fail to "check up" before proceeding onto the road. Johnson's interpretation of the relevant statute — which is reasonable — is that a driver need not come to a complete stop, but must use caution to ensure that there is no oncoming traffic. He observed Defendant fail to exercise that caution.

— had occurred when law enforcement officials lifted the defendant's shirt sleeve to examine the tattoos he had. The district court suppressed other evidence that was challenged but not the "identity" evidence.

On appeal, the Eleventh Circuit affirmed. Our circuit court concluded that the photographic and fingerprint evidence — which had been "offered solely to prove the identity of the defendant" — were "not suppressible" because "the social costs of excluding [that evidence was] great, while the deterrence benefits [were] minimal." *Farias-Gonzalez*, 556 F.3d at 1187–89. "Both the court and the Government are entitled to know who the defendant is," and "[t]o allow the use of the exclusionary rule to exclude evidence of who the defendant is would be a significant social cost." *Id*. at 1187–88. The court reasoned that social cost is "particularly evident" in a Section 1326 case, because the defendant's presence in the country is "an ongoing crime."[7] *Id.* at 1118 n.8. The court concluded:

> Therefore, we hold that the exclusionary rule does not apply to evidence **to establish the defendant's identity** in a criminal prosecution, and accordingly, the fingerprint and photographic evidence in this case **offered to prove Farias-Gonzalez's identity** is not suppressible.

*Id*. at 1189 (emphasis added).

The court in *Farias-Gonzalez* also held that the information contained in the defendant's alien file — including his fingerprints, photograph, and deportation history — was not subject to

---

[7] That is, there is an ongoing Section 1326 violation so long as the illegal alien is in the country and not under arrest for violating that statute. *See United States v. Coeur*, 196 F.3d 1344, 1346 (11th Cir. 1999).

suppression where the Government knew the identity of the defendant and had his alien file in its possession.[8] *Id.* at 1189.

Defendant argues that because *Jones* applied the exclusionary rule to evidence discovered by use of a GPS device, it follows that the *Farias-Gonzalez* holding must yield to the *Jones* rule. The problem with this analysis is that the Eleventh Circuit, in *Farias-Gonzalez* and other cases, has found identity evidence is *admissible* even in the face of a Fourth Amendment challenge (and thus affirmed denial of a motion to suppress) when confronted with other, clear violations of the Fourth Amendment (*i.e.*, that did not involve a GPS analysis). Therefore, *Jones'* declaration that warrantless use of a GPS constitutes a Fourth Amendment violation does not directly answer the question here. Even if obtained by means of what would otherwise be a violation of the Fourth Amendment, this so-called identity evidence is still admissible to prove a person's identity.

Defendant also asserts that there is a conflict between *Farias-Gonzalez* and an earlier line of Supreme Court decisions, that there exists an inherent tension between *Farias-Gonzalez* and *Jones*, and in light of that conflict and tension, *Farias-Gonzalez* must be revisited. (Doc. # 11 at 6-8, 9). Similarly, Defendant points to other circuit decisions that he argues are in conflict with (and are

---

[8] The Eleventh Circuit has followed *Farias-Gonzalez* in two more recent unpublished decisions. *See United States v. Vasquez-Garcia*, 344 Fed. Appx. 591, 592 (11th Cir. 2009) (unpublished) (per curiam) (affirming the denial of a defendant's motion to suppress photographs, fingerprints, and alien file); *United States v. Aguila-Perez*, 344 Fed. Appx. 521, 523 (11th Cir. 2009) (unpublished) (per curiam) (affirming a conviction for illegal re-entry based on "identity-related evidence concerning his name and fingerprints, and information from his pre-existing alien file"; any error in denying the defendant's motion to suppress was harmless because such identity-related evidence was "not suppressible" even if obtained in violation of the Fourth Amendment).

better reasoned than) *Farias-Gonzalez*. (Doc. # 11 at 17–22). But even if all these points are true, it is the Eleventh Circuit's place to revisit its case law, not this court's.[9]

Thus, while the court assumes the use of the GPS device violated the Fourth Amendment, and even further assumes (without deciding)[10] that such a violation tainted the subsequent traffic stop (which was otherwise supported by probable cause of a traffic violation), Defendant is not entitled to suppression of identity-related evidence obtained as a result of the alleged violation.

2. **Even Assuming There Was a Fourth Amendment Violation, Suppression is Not Warranted Because the Agents Acted in Good Faith.**

The motion to suppress is due to be denied for a separate, independent reason: even assuming there was a Fourth Amendment violation, and even assuming further the court has misapplied *Farias-Gonzalez*, the good-faith exception to the exclusionary rule applies here such that suppression is not warranted. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Thus,

---

[9] Defendant further argues that three pre–*Farias-Gonzalez* decisions: *Davis v. Mississippi*, 394 U.S. 721 (1969); *Hayes v. Florida*, 470 U.S. 811 (1985), *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1042 (1984), require re-examination of that decision. However, each of those decisions was cited in the *Farias-Gonzalez* opinion. Any argument that the Eleventh Circuit misinterpreted those cases in *Farias-Gonzalez* must be made to the Eleventh Circuit, sitting *en banc*, not this court.

[10] The court does not decide this question for two reasons. First, a factual finding on this point is unnecessary because even if the Fourth Amendment violation tainted the subsequent traffic stop, that is not a basis for suppression of the identity evidence at issue here. Second, the GPS violations had arguably occurred well before the traffic stop in question. On the day in question, December 21, 2011, there is no indication that McKenzie utilized the GPS tracking device to monitor Defendant. Rather, the record indicates that he and two of his fellow agents, without use of the GPS device, initiated physical surveillance at the Five Guys, and then followed Defendant back to the Apartments. It was during that surveillance that the traffic stop was initiated. Thus, notwithstanding Defendant's assertion that use of the GPS device "led directly to the stop" (Doc. # 11 at p. 6 n.1), the record evidence does not support that finding here.

suppression may be warranted "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id*. "But when the police act with an objectively reasonable good faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way." *Davis v. United States*, 131 S. Ct. 2419, 2427-28 (2011). "[W]hen the police conduct a search in objectively reasonable reliance on binding judicial precedent" that was later reversed, there is no wrongdoing to deter and thus no justification for suppression of evidence. *Id*. at 2428-29; *see U.S. v. Lebowitz*, 676 F. 3d 1000, 1010 (11th Cir. 2012) (law enforcement official's good-faith reliance on Eleventh Circuit precedent, "which until recently allowed a search incident to a recent occupant's arrest regardless of the occupant's ability to access the passenger compartment," precluded exclusion of the evidence).

The good-faith exception applies here because at the time McKenzie used the GPS tracking device, binding Eleventh Circuit law allowed the use of such devices without a warrant. In 1981, the former Fifth Circuit held that placing an electronic beeper on the exterior of a defendant's car when the car was parked in a public lot did not violate the Fourth Amendment, where the officers had reasonable suspicion of criminal activity. *See United States v. Michael*, 645 F. 2d 252, 255-256 (5th Cir. 1981) (en banc).[11] Thus, when McKenzie attached the GPS device to Rosas-Illescas' truck in December 2011, he only did what the law allowed at that time.

---

[11] In July 2010, the Eleventh Circuit, relying upon *Michael*, held in an unpublished decision that installation of a GPS device on a defendant's car did not violate the Fourth Amendment "because the [car] was parked in a place easily accessible to the public and was reachable from a public thoroughfare" so that the defendant "had no reasonable expectation of privacy with respect to the exterior of the vehicle." *United States v. Smith*, 387 Fed. Appx. 918, 921 (11th Cir. 2010) (unpublished) (per curiam).

To be sure, *Jones* held that attaching a GPS device to a defendant's car is a "search" for purposes of the Fourth Amendment. But *Jones* did not decide whether such a search would be unreasonable in circumstances like the circumstances here. And more importantly for present purposes, *Jones* was not decided until January 23, 2012 – *after* the conduct at issue here. Because McKenzie's conduct was consistent with then-applicable legal standards, a suppression remedy is not due to be granted here.

## III. CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress (Doc. #6) is due to be denied. The court will enter a separate order.

**DONE** and **ORDERED** this   30th   day of May, 2012.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE